IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

DAVID FIGUEROA,    )  CASE NO.  1:19-cv-02538
          )
     Plaintiff,  )  MAGISTRATE JUDGE
          )  KATHLEEN B. BURKE
    v.    )
          )
COMMISSIONER OF SOCIAL  )
SECURITY,     )
          )  **<u>MEMORANDUM OPINION & ORDER</u>**
     Defendant. )

Plaintiff David Figueroa ("Plaintiff" or "Figueroa") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 14.

For the reasons explained herein, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

On December 16, 2016, Figueroa filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  Tr. 17, 86-87, 207-214, 215-218.  Figueroa alleged a disability onset date of September 27, 2016.  Tr. 17, 207, 215, 232.  He alleged

disability due to diabetes, liver disease, spine out of place and spinal stenosis, bulging disc, herniated disc, lumbosacral neuritis, and sciatic nerve.  Tr. 64-65, 89, 113, 132, 236.

After initial denial by the state agency (Tr. 112-120) and denial upon reconsideration (Tr. 131-150), Figueroa requested a hearing (Tr. 151-157).  A hearing was held before an Administrative Law Judge ("ALJ") on June 26, 2018.  Tr. 35-63.  On September 27, 2018, the ALJ issued an unfavorable decision (Tr. 11-34), finding that Figueroa had not been under a disability, as defined in the Social Security Act, from September 27, 2016, through the date of the decision (Tr. 18, 30).  Figueroa requested review of the ALJ's decision by the Appeals Council.  Tr. 204-206.  On August 26, 2019, the Appeals Council denied Figueroa's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-8.

## II. Evidence

### A.    Personal, vocational and educational evidence

Figueroa was born in 1972.  Tr. 28, 43, 207.  Figueroa reported that he could not speak and understand English, he could not read and understand English, and he could not write more than his name in English.  Tr. 235.  Figueroa completed school through seventh grade.  Tr. 56, 237.  Figueroa's past work included work as a construction worker and as a landscape laborer.  Tr. 45-46, 56.

### B.    Medical evidence

#### 1.    Treatment history

In July 2015, Figueroa saw Sharon Lyons, CNP, at the Cleveland Clinic for follow up regarding a recent exacerbation of chronic low back pain.  Tr. 394.  He had been seen in the emergency room in May 2015 for his back pain and had been treated with conservative therapy since that time with modest improvement.  Tr. 394.  Figueroa reported improvement with

NSAIDS, rest and lifting restrictions.  Tr. 394.  In June 2015, Figueroa had swelling and pain in his knee but his knee pain had resolved.  Tr. 394.  Nurse Lyons noted that Figueroa was being seen at the Diabetes Center.  Tr. 394.  Nurse Lyon's assessment was degenerative joint disease and degenerative disc disease (lumbar), diabetes, and back pain.  Tr. 396.  Nurse Lyons recommended consultations with a chiropractor and the spine center for the degenerative joint disease and recommended that Figueroa follow up with the Diabetes Center as planned.  Tr. 396.

During a routine check-up on August 6, 2015, with Vidhya Karivedu, M.D., at the Cleveland Clinic, Figueroa relayed that he had seen a spine specialist who adjusted his medications for his low back pain.  Tr. 401.  Figueroa relayed that he had been checking his blood sugars at home and his levels were in the 130-140 range.  Tr. 401.  On physical examination, Figueroa had a normal range of motion in his spine; his muscular strength was intact, and there was no joint swelling, deformity or tenderness.  Tr. 402.

On September 27, 2016, Figueroa was seen at the emergency room complaining of low back pain and numbness in his left leg.  Tr. 295.  He relayed that he had chronic back problems including a prior back surgery.  Tr. 295.  Figueroa indicated that his current pain had started three days earlier while he was at work – he was pulling a heavy object and felt a strain in his low back.  Tr. 296.  He was having pain in the lower lumbar region with occasional radiation into his left thigh.  Tr. 296.  Figueroa's use of over-the-counter medication had not helped.  Tr. 296.  He had tried to return to work but his pain had limited his ability to work.  Tr. 296.  A musculoskeletal physical examination revealed normal range of motion; lower lumber discomfort with palpation on the left extending into the left gluteal region; normal torso range of motion with some discomfort; and normal range of motion of the hip and knee.  Tr. 297.  Figueroa's gait was normal.  Tr. 297.  No motor or sensory deficits were observed.  Tr. 297.

Figueroa was discharged home with a diagnosis of acute left-sided low back pain with left-sided sciatica. Tr. 297-298.

Figueroa's symptoms persisted and, on September 28, 2016, he saw chiropractor Kenneth Stern, D.C. Tr. 329-331. Figueroa complained of a flare up in his lower back that he related to raking stones at work. Tr. 329. Figueroa described his pain as constant and moderate, rating his pain a 7-9 out of 10. Tr. 329. Dr. Stern noted the following examination findings: no evidence of spinal listing in the lumbar spine; decreased lordotic curvature; swelling at the base of the sacrum, moderate tenderness with deep palpation in the region; spasms over the lumbar paravertebral muscles; decreased sensation in the lower left extremity; lumbar paraspinal muscle strength was 4/5 bilaterally; no atrophy in the right or left thigh or calf; Ely's and straight leg raise test were positive bilaterally at 55 degrees; gait was slightly antalgic; lumbar range of motion was limited; deep tendon reflexes were +1 bilaterally; and heel and toe walk were negative. Tr. 329. Dr. Stern recommended that Figueroa continue treatment for 12 sessions over the next month, continue with home exercises, and obtain a lumbar MRI. Tr. 330. Dr. Stern provided Figueroa with activities of daily living restrictions. Tr. 331.

Figueroa continued to treat with Dr. Stern throughout 2016. Tr. 331-344. Throughout his treatment with Dr. Stern, Figueroa continued to have decreased range of motion and tenderness in the lumbar area and base of the sacrum. Tr. 331-341.

During an October 24, 2016, visit, Figueroa reported slow but steady improvement since starting treatment with Dr. Stern. Tr. 336. Dr. Stern noted a gradual increase in Figueroa's lumbar range of motion. Tr. 336. During that visit, straight leg test was positive bilaterally at 55 degrees. Tr. 336. Dr. Stern continued to recommend an MRI to rule out a possible lumbar disc

problem.  Tr. 333, 336.  Also, in October, Dr. Stern recommended a lumbar support belt.  Tr. 333, 335, 337.

During a November 4, 2016, visit, Figueroa noted slight improvement from his prior visit but he noted that he continued to have intermittent pain that was aggravated by bending forward or backward.  Tr. 338.  During a November 21, 2016, visit, Figueroa continued to report intermittent pain.  Tr. 340.  He rated his pain at a 4-5 out of 10.  Tr. 340.

Dr. Stern re-evaluated Figueroa on December 2, 2016.  Tr. 342, 350.  Figueroa complained of continued intermittent lower back pain rated at a 5 out of 10 with pain radiating into the buttocks and lower left extremity.  Tr. 350.  Physical examination findings were similar to examination findings from the September 28, 2016, examination.  Tr. 329, 350.  Dr. Stern recommended that Figueroa continue chiropractic treatments three times per week and continue stretches and moist heat at home.  Tr. 342.  Dr. Stern also recommended an ortho consult and continued to recommend lumbar back support.  Tr. 342.

A lumbar MRI was performed on December 2, 2016.  Tr. 347-348.  The MRI showed disc herniation at L1-2, L4-5, and L5-S1 levels.  Tr. 348.

Figueroa continued to see Dr. Stern on an as needed basis during 2017.  Tr. 345-346, 349, 351-353, 454-457.  During a January 4, 2017, visit, Figueroa complained of continued intermittent/occasional lower back pain that he rated a 3-4 out of 10.  Tr. 345.  Figueroa relayed that his pain was radiating into the buttocks and lower left extremity.  Tr. 345.  Dr. Stern recommended home exercises, a lumbar support belt and ortho consult.  Tr. 345.

During a February 6, 2017, visit, Figueroa continued to complain of intermittent lower back pain but showed slight improvement from treatments he had received.  Tr. 352.  On physical examination, Figueroa exhibited moderate tenderness with deep palpation over the

lumbosacral region; sensation was decreased over the right lower extremity; radiculopathy was present during straight leg raise testing; lumbar range of motion was limited; Ely's test was positive; and gait was undisturbed.  Tr. 352.  Dr. Stern continued to recommend an ortho consult.  Tr. 352.  He also recommended a TENS unit, home exercises, and chiropractic treatment once per week.  Tr. 349.

On February 10, 2017, Figueroa saw Dr. Stern and complained of continued intermittent/frequent pain in his lower back with the pain occasionally radiating to the hips and legs.  Tr. 349.  Aggravating factors included continued standing, bending and walking.  Tr. 349.  Figueroa rated his pain at a 6 out of 10.  Tr. 349.  Dr. Stern continued to recommend an ortho consult.  Tr. 349.  He also recommended home exercises and that Figueroa continue chiropractic treatment once per week.  Tr. 349.

On March 3, 2017, Figueroa reported that his lower back pain was a 4-6 out of 10.  Tr. 353.  Dr. Stern's recommendations remained unchanged.  Tr. 353.

Figueroa saw Nurse Lyons for a follow-up visit regarding his diabetes on March 22, 2017.  Tr. 461-463, 466.  On review of systems, Nurse Lyons noted back pain from a work injury for which Figueroa was being treated by an outside provider.  Tr. 462.  On physical examination, Nurse Lyons observed that Figueroa had an upright and steady gait; reduced lumbar range of motion; and positive straight leg raise on the left.  Tr. 462.  There were no sensory or motor deficits and reflexes in the upper and lower extremities were normal.  Tr. 462.  Nurse Lyons' assessment included poorly controlled Type 2 diabetes mellitus without complication; chronic thoracic back pain, unspecified back pain laterality, with a note that Figueroa was continuing treatment with a pain center and she noted "cane"; bulging of lumbar intervertebral disc, stable; and osteoarthritis of spine with radiculopathy, lumbar region, stable.

Tr. 462-463.  Treatment records also indicate that Figueroa requested a cane on March 22, 2017.

Tr. 466.  In a disability report completed by Figueroa with the help of his wife, Figueroa stated

that he was prescribed a cane on March 22, 2017.  Tr. 259.

Figueroa saw Dr. Khaleel Deeb, M.D., a family practice physician on April 24, 2017, for

an initial visit regarding his diabetes.  Tr. 482-484.  Figueroa relayed that he saw an

endocrinologist in 2012 regarding his diabetes but since then his primary care physician had been

providing refills for his diabetes medications.  Tr. 482.  Dr. Deeb noted that the history that

Figueroa provided was limited due to a language barrier and no interpreter being used.  Tr. 482.

Figueroa reported blurred vision and pain in his eyes; constipation; dysuria; dizziness;

headaches; and right knee pain.  Tr. 482.  Dr. Deeb observed that Figueroa's musculoskeletal

examination showed no edema or tenderness and Figueroa's gait was normal.  Tr. 483.  Dr. Deeb

assessed uncontrolled Type 2 diabetes mellitus without complication.  Tr. 483.

During an April 28, 2017, visit with Dr. Stern, Figueroa complained of continued

intermittent moderate pain in his lower back that Figueroa rated at a 4-5 out of 10.  Tr. 454.

Figueroa relayed that his back pain occasionally radiated to the hips and legs and it was

aggravated by continued standing, bending, and walking.  Tr. 454.

Figueroa saw Dr. Deeb for a follow-up visit on May 25, 2017, regarding his diabetes.  Tr.

485.  Figueroa relayed he was compliant with all his medications.  Tr. 485.  Figueroa reported

bilateral leg weakness secondary to bulging lumbar disk.  Tr. 486.  On examination, Dr. Deeb

observed normal range of motion and no edema, tenderness, or deformity.  Tr. 486.  Figueroa's

reflexes were normal; he exhibited normal muscle tone; and his gait and coordination were

normal.  Tr. 486.  Dr. Deeb assessed uncontrolled Type 2 diabetes mellitus without complication;

osteoarthritis of spine with radiculopathy, lumbar region; bulging of lumbar intervertebral disc;

and mild persistent asthma without complication, stable.  Tr. 486-487.  Under the bulging of

lumbar intervertebral disc assessment, Dr. Deeb listed "cane."  Tr. 487.

During May and June 2017 visits with Dr. Stern, Figueroa's pain complaints were

unchanged, although on May 31, 2017, he rated his pain at a 4 out of 10 and, on June 28, 2017,

he rated his pain at a 3-4 out of 10.  Tr. 455-456.  Physical examination findings were similar to

past examination findings.  Tr. 455-456.

During a follow-up visit with Dr. Deeb on June 29, 2017, regarding his diabetes,

Figueroa reported no worsening of his symptoms since his last visit.  Tr. 489.  Dr. Deeb noted

that no language interpreter was used during the visit.  Tr. 489.  On physical examination. Dr.

Deeb observed normal range of motion, no edema or tenderness, normal reflexes, normal muscle

tone, normal gait and normal coordination.  Tr. 490.  Dr. Deeb's assessment was uncontrolled

Type 2 diabetes mellitus without complication with an adjustment made to Figueroa's diabetes

medication.  Tr. 490.

On July 28, 2017, Figueroa complained of intermittent/occasional moderate pain in his

lower back with occasional radiation into the hips and legs.  Tr. 457.  Figueroa's pain was

aggravated by continued standing, bending, and walking.  Tr. 457.  He rated his pain at a 3 out of

10.  Tr. 457.  Physical examination findings were similar to past examination findings.  Tr. 457.

Dr. Stern continued to recommend home exercises and an ortho consult.  Tr. 457.  Dr. Stern

indicated that Figueroa should remain on TTD (temporary total disability).  Tr. 457.

Throughout his treatment of Figueroa, Dr. Stern recommended that Figueroa remain on

TTD. Tr. 328, 330, 331, 332, 346, 349, 351, 353, 454, 455, 456, 457.

During an October 5, 2017, visit with Dr. Deeb for follow up regarding his diabetes,

Figueroa reported he had a history of chronic back pain due to a herniated disc and he was

requesting something for his pain.  Tr. 495.  On physical examination. Dr. Deeb observed normal

range of motion, no edema or tenderness, normal reflexes, normal muscle tone, normal gait and

normal coordination.  Tr. 496.  Dr. Deeb's assessment was uncontrolled Type 2 diabetes mellitus

without complication.  Tr. 496.  Dr. Deeb made some adjustment to Figueroa's diabetes

medication.  Tr. 496.  Dr. Deeb also assessed osteoarthritis of spine with radiculopathy, lumbar

region and prescribed gabapentin 300 mg capsule.  Tr. 497.

Figueroa started seeing Dr. George Friedhoff, D.O., for his back pain on November 20,

2017.  Tr. 510-514.  Figueroa relayed that he was taking ibuprofen around the clock for more

than eight weeks with low back pain radiating into the left lower extremity that was constant and

aggravated with extension and standing for more than 5-10 minutes.  Tr. 510.  Figueroa's

reported pain level was 7 out of 10.  Tr. 510.  Dr. Friedhoff reviewed x-rays and imaging and

noted that, based on his interpretation, the x-rays and imaging showed significant L4-5, L5-S1

stenosis and associated herniated intervertebral disc.  Tr. 510.  On examination, Dr. Friedhoff

observed Figueroa to be in moderate pain/distress.  Tr. 511.  The musculoskeletal examination

showed "joint tenderness[;] positive dural tension tests radiating into the left lower extremity L4

and L5 dermatomal distribution with weakness with pain inhibition testing with ankle

dorsiflexion testing and left hip abduction testing with loss of sensation to light touch and

pinprick and L4-5 dermatomal distribution left lower extremity[.]"  Tr. 512.  The neurological

examination showed "weakness . . . , decreased sensation to pinprick[,] and decreased sensation

to light touch[.]"  Tr. 512.  Figueroa's gait was antalgic.  Tr. 512.  Figueroa's range of motion

was limited; there was paraspinal tenderness at the L4-L5 area.  Tr. 512.  Straight leg raise

testing on the left was positive but negative on the right.  Tr. 512.  Dr. Friedhoff's impression

was lumbar back pain with radiculopathy affecting lower extremity; herniation of left side of L4-

L5 intervertebral disc; and lumbar radiculopathy.  Tr. 513-514.  Dr. Friedhoff recommended epidural steroid injections.  Tr. 513-514.

Figueroa saw Dr. Friedhoff on December 18, 2017.  Tr. 515-519.  Figueroa reported a pain intensity level of 1 but indicated that his back pain was still very painful.  Tr. 516.  Examination findings were similar to the prior visit with Dr. Friedhoff.  Tr. 517-518.  Dr. Friedhoff's impression was herniation of left side of L4-L5 intervertebral disc and lumbar back pain with radiculopathy affecting lower extremity.  Tr. 518-519.  Dr. Friedhoff recommended left L4 and left L5 selective nerve root blocks.  Tr. 518-519.

On January 9, 2018, Dr. Friedhoff administered L4 and L5 selective nerve root blocks.  Tr. 520.  The noted preoperative and postoperative diagnoses were lumbar stenosis.  Tr. 520.

Following his nerve blocks, Figueroa saw Dr. Friedhoff on January 18, 2018.  Tr. 521.  Figueroa reported 80-90% relief from the blocks.  Tr. 521.  Figueroa's reported pain level was a 6.  Tr. 522.  On physical examination, Figueroa exhibited joint tenderness; there was full range of motion in all joint extremities; his gait was normal on ambulation; sensation was intact to light touch and pinprick; motor strength was 5/5 in the lower and upper extremities bilaterally; range of motion was limited; and there was paraspinal tenderness in the L4-L5 area.  Tr. 522-523.  Straight leg raise testing on the left was positive but negative on the right.  Tr. 523.  Dr. Friedhoff's impression was facet syndrome of lumbar spine and neuroma.  Tr. 524.  Dr. Friedhoff noted that a determination would be made in three to four weeks regarding whether Figueroa would need lumbar facet injections.  Tr. 524.  Dr. Friedhoff advised Figueroa to avoid activity that increased his discomfort; apply moist heat and/or ice to his lower back; take medication as instructed for pain relief; and to try topical Lidoderm ointment every 8 hours as needed.  Tr. 524.

Figueroa saw Dr. Friedhoff on January 29, 2018, for follow up.  Tr. 531-534.  Figueroa was reporting pain at a level of 8.  Tr. 531.  Dr. Friedhoff's impression was facet syndrome of the lumbar spine.  Tr. 534.  He recommended that Figueroa proceed with facet injections.  Tr. 534.

On January 29, 2018, Figueroa also saw Dr. Deeb regarding his diabetes.  Tr. 498. Figueroa relayed that he had not been taking any medications for a few months due to lack of insurance but he had acquired coverage through Caresource.  Tr. 498.  Figueroa's glucometer had broken so he had not been checking his blood sugars at home.  Tr. 498.  He was not exercising.  Tr. 498.  Figueroa's symptoms were worsening.  Tr. 498.  Dr. Deeb noted that the history was provided by Figueroa and his spouse.  Tr. 498.  On examination, range of motion was normal and his gait was normal.  Tr. 499.  Dr. Deeb's assessment was uncontrolled Type 2 diabetes mellitus without complication.  Tr. 499.  Dr. Deeb noted poor adherence to his diabetes plan of care.  Tr. 499.  Dr. Deeb also assessed osteoarthritis of spine with radiculopathy, lumbar region, noting that it was stable.  Tr. 499.

During a March 1, 2018, visit with Dr. Deeb, Figueroa reported he continued to have some issues with insurance coverage for his diabetic medication but he had been taking his medications regularly for the prior month.  Tr. 501.  Dr. Deeb noted that the history was limited due to a language barrier and no interpreter being used.  Tr. 501.  Dr. Deeb's assessment was that Figueroa's diabetes was poorly controlled.  Tr. 502.

On March 27, 2018, Dr. Friedhoff administered bilateral L5-S1 facet injections.  Tr. 536.

Figueroa saw Dr. Deeb on May 8, 2018, for follow up regarding his diabetes.  Tr. 504-506.  Figueroa reported compliance with all medication except Invokana which he stopped because it was causing him to have to use the restroom too much.  Tr. 504.  A physical

examination showed normal range of motion; no edema or tenderness; normal muscle tone; normal reflexes; normal gait and coordination.  Tr. 505.  Dr. Deeb's assessment was uncontrolled Type 2 diabetes mellitus without complication, poorly controlled; and osteoarthritis of spine with radiculopathy, lumbar region, pain well controlled.  Tr. 505-506.  Dr. Deeb advised Figueroa to restart Invokana by taking a half a pill a day to help with the increased polyuria side effect.  Tr. 505.  Dr. Deeb encouraged Figueroa to engage in exercise, stretching and weight loss.  Tr. 505-506.

### 2.  Opinion evidence

#### a.  Consultative examiner

On March 7, 2017, Robin Benis, M.D., conducted a consultative examination.  Tr. 355-364.  Dr. Benis observed that Figueroa appeared to be in mild distress; his gait was abnormal; he walked slowly because of his back pain; he could not walk on his heels or toes; he could not squat; his stance was normal; he did not use an assistive device; he required assistance getting on and off the examination table; and he could rise from a chair without difficulty. Tr. 356.  Figueroa had normal range of motion in all areas except the dorsolumbar spine where Figueroa exhibited a reduced range of motion.  Tr. 361-362.  Figueroa exhibited low back pain when lifting the right and left leg to 20 degrees supine and 5 degrees sitting, with more pain on the left than right.  Tr. 357.

Dr. Benis opined that Plaintiff had moderate limitations in standing and walking, going up and down stairs, and lifting heavy objects due to lumbosacral spine pain, herniated discs, and sciatica.  Tr. 358.  Dr. Benis also opined that Figueroa should not be exposed to smoke or dust due to his asthma.  Tr. 358.

#### b.  State agency reviewers

On March 10, 2017, state agency reviewing consultant Rannie Amiri, M.D., completed a physical RFC assessment.  Tr. 70-72.  Dr. Amiri opined that Figueroa had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; and sit for a total of about 6 hours in an 8-hour workday. Tr. 70-71.  Dr. Amiri opined that Figueroa's ability to push/pull was unlimited, other than as indicated for the lift and/or carry limits.  Tr. 71.  With respect to postural limitations, Dr. Amiri opined that Figueroa could never climb ladders/ropes/scaffolds; occasionally stoop and crawl; and frequently climb ramps/stairs, kneel and crouch.  Tr. 71.  Dr. Amiri found no limitations in Figueroa's ability to balance.  Tr. 71.  Dr. Amiri found no manipulative, visual, or communicative limitations.  Tr. 71.  With respect to environmental limitations, Dr. Amiri opined that Figueroa would need to avoid all exposure to hazards, specifically he would need to avoid unprotected heights.  Tr. 72.

Upon reconsideration, on May 8, 2017, state agency reviewing consultant Stephen Sutherland, M.D., completed a physical RFC assessment, affirming Dr. Amiri's RFC assessment. Tr. 94-96.

## C.      Testimonial evidence

### 1.       Plaintiff's testimony

Figueroa was represented and testified at the hearing with the assistance of an interpreter. Tr. 37-38, 43-55, 56.  Figueroa's wife drove him to the hearing.  Tr. 43-44.  Figueroa drives but not often.  Tr. 44.  Figueroa relayed that he had not worked since his alleged onset date of September 27, 2016.  Tr. 44.  He indicated that he has not been able to work because when he is active and bends down his leg and back hurt him a lot.  Tr. 44.  Also, standing and walking cause Figueroa's leg and back to hurt.  Tr. 44-45.  He explained that he starts to feel pain in his back

after walking for a couple of minutes.  Tr. 45.  Sometimes Figueroa has to stop walking or, if he continues to walk, he has to slow down his pace.  Tr. 45.

Figueroa hurt himself at work in 2016 when he was lifting heavy objects and raking rocks.  Tr. 46.  He had to go to the hospital.  Tr. 46.  Figueroa received chiropractic treatment as part of his workers compensation claim.  Tr. 46-47.  More recently, Figueroa was seeing Dr. Friedhoff for his pain medication.  Tr. 48-49.  In addition to prescribing pain medication, Dr. Friedhoff recommended that Figueroa perform light passive exercises at home.  Tr. 53-54.  A doctor recommended surgery for his back problems but Figueroa does not want to have surgery.  Tr. 52.  His doctor has tried injections.  Tr. 52.

Figueroa sees Dr. Deeb for his diabetes.  Tr. 47.  Figueroa had talked with Dr. Deeb at one point and explained that he was having severe pain in his back and feeling weak on one side.  Tr. 47.  According to Figueroa, following that discussion, Dr. Deeb prescribed a cane.  Tr. 47.  Figueroa indicated that he uses a cane most of the time, both outside and inside his home.  Tr. 47.  He estimated being able stand for about three to five minutes without his cane.  Tr. 47-48.  And he estimated being able to walk a few feet without his cane.  Tr. 48.  Figueroa explained that he needs to use the cane because his balance is off and because of his pain.  Tr. 48.  Figueroa had his cane with him at the hearing.  Tr. 49.  Figueroa's cane is a single point cane.  Tr. 49.  It was suggested to Figueroa that he use a four-prong cane but he chose to use the single point cane because it is lighter.  Tr. 49.  Figueroa estimated being able to comfortably lift about five to ten pounds.  Tr. 49-50.  Figueroa felt that his diabetes would limit his ability to work because he has to eat at scheduled times and, if he was at work, he would not be able to do that.  Tr. 50.  Symptoms associated with his diabetes included tiredness and dizziness.  Tr. 50.

Figueroa also has asthma for which he uses a spray as needed.  Tr. 50-51.  On average, Figueroa has to use his asthma spray once or twice a day.  Tr. 51.  Figueroa explained that he listed liver disease on his disability application because, if he takes aspirin, it affects his liver.  Tr. 51.

Figueroa indicated he is not able to read any English words.  Tr. 52.  When asked about his ability to read stop signs and other street signs when driving, Figueroa indicated he can understand some signs but not others.  Tr. 52.  When he was working, Figueroa was able to understand some instructions, however, because he knew the job well, he did not require a lot of instructions.  Tr. 52-53.  Also, most of Figueroa's coworkers and his boss spoke Spanish so that helped with receiving and understanding instructions.  Tr. 54.  Figueroa has conversations with his doctors without an interpreter present.  Tr. 53.  However, his wife accompanies him to his doctor visits so, if he is unable to answer a question, his wife is with him to respond for him.  Tr. 53.

### 2.      Vocational expert's testimony

A Vocational Expert ("VE") testified at the hearing.  Tr. 55-62.  The VE described Figueroa's past work to include work as: (1) a construction worker, a heavy, semi-skilled job; and (2) a landscape laborer, a heavy, semi-skilled job.  Tr. 56.  The ALJ then asked the VE a series of hypothetical questions all of which would be based on a person being the same age as Figueroa (a younger individual, born in 1972) and having the same educational (seventh grade) and vocational background as Figueroa.  Tr. 56.

The ALJ asked the VE to consider an individual who could perform work at the light exertional level with the following additional limitations – the individual could not climb, ladders, ropes or scaffolds; could frequently climb ramps and stairs; could occasionally stoop or

crawl; could frequently kneel or crouch; must avoid all exposure to hazards such as unprotected heights; and must avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. Tr. 57.  The ALJ asked the VE whether the described individual would be able to perform any of Figueroa's past work.  Tr. 57.  The VE indicated that the described individual could not perform Figueroa's past work because of the exertional level but there were other jobs that the described individual could perform, including a laundry bagger, bakery racker, and small product assembler.  Tr. 57.  The VE provided national job incidence data for the identified jobs.  Tr. 57. The ALJ then asked the VE whether the identified jobs could be performed by someone who is not a native English speaker but who does understand some spoken English.  Tr. 58.  The VE responded, "I believe so, yes[.]"  Tr. 58.  Also, the VE indicated that the jobs identified were jobs that could be learned through a brief demonstration.  Tr. 58.

Then the ALJ asked the VE whether there would be jobs that the individual described in the first hypothetical could perform if the exertional level was changed from light to sedentary. Tr. 58.  The VE indicated there would be jobs available, including a lens inserter, optical assembler, and surveillance system monitor.  Tr. 58-59.  The VE provided national job incidence data for the identified jobs.  Tr. 58-59.  The VE also indicated that he believed that the jobs identified in response to the second hypothetical could be performed by someone who has limited ability to speak English.  Tr. 60-61.

Figueroa's counsel asked the VE whether there was transferability of skills from Figueroa's past work to any sedentary work.  Tr. 59-60.  The VE responded that there were no transferable skills.  Tr. 60.  Also, the VE indicated there would be no skills that would transfer to the light jobs.  Tr. 60.

In response to further questioning by the ALJ, the VE indicated that, if the individual described in the first hypothetical needed a cane for ambulation, there would be no light exertional jobs that the individual could perform.  Tr. 60.  However, an individual requiring a cane for ambulation would be able to perform the jobs the VE identified in response to the second, the sedentary, hypothetical.  Tr. 60.

The VE explained that being off task up to and including 10 percent of the time is generally acceptable in most work settings.  Tr. 62.  Therefore, being off task greater than 10 percent of the time will usually preclude any competitive work.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[2] claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In his September 27, 2018, decision the ALJ made the following findings:[4]

1.      Figueroa meets the insured status requirements of the Social Security Act through December 31, 2020.  Tr. 20.

---

[2] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[4] The ALJ's findings are summarized.

2.    Figueroa has not engaged in substantial gainful activity since September 27, 2016, the alleged onset date.  Tr. 20.

3.    Figueroa has the following severe impairments: osteoarthritis of the spine, diabetes mellitus, and asthma.  Tr. 20-21. Figueroa's alleged liver disease was a non-severe impairment and his alleged visual impairment was a nonmedically determinable impairment.  Tr. 20-21.

4.    Figueroa does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.  Tr. 21-22.

5.    Figueroa has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except he can never climb ladders, ropes or scaffolds; can frequently climb ramps and stairs, kneel, or crouch; can occasionally stoop or crawl; must avoid all exposure to hazards such as unprotected heights; and avoid concentrated exposure to fumes, odors, dust, gases, and poorly ventilated areas.  Tr. 22-28.

6.    Figueroa is unable to perform any past relevant work.  Tr. 28.

7.    Figueroa was born in 1972 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 28.

8.    Figueroa has a limited education and limited English proficiency.  Tr. 28.

9.    Transferability of job skills is not an issue because Figueroa's past relevant work is unskilled.  Tr. 28.

10.   Considering Figueroa's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Figueroa can perform, including bagger, laundry; racker, bakery; and small products assembler.  Tr. 29-30.

Based on the foregoing, the ALJ determined Figueroa had not been under a disability, as defined in the Social Security Act, from September 27, 2016, through the date of the decision. Tr. 30.

## V. Plaintiff's Arguments

Figueroa argues that the ALJ's RFC and Step Five finding are contrary to law and not supported by substantial evidence because the ALJ failed to properly evaluate the evidence

regarding his use of a cane and inability to communicate in English. Figueroa contends that his inability to communicate in English considered in conjunction with his need to use a cane, which would limit him to sedentary work, is outcome-determinative because based on those factors, as of his 45th birthday, the Medical-Vocational Guidelines (the "Grid")[5] would direct a finding of "disabled."

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence

---

[5] The Medical-Vocational Guidelines, known as the "Grid," are located at 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Grid"). The Grid includes rules that may be applied "in cases where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work." 20 C.F.R. § 404.1569. The rules "do not cover all possible variations of factors." *Id.* "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Part 404, Subpart P, § 200.00 of Appendix 2. However, "[w]here any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." *Id.*

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.      The ALJ did not err in evaluating evidence relating to Figueroa's use of a cane**

Figueroa argues that the ALJ's failure to include the need to use a cane in the RFC was clear error where the ALJ acknowledged Figueroa's use of a cane for at least periods of time.  He contends that the ALJ's analysis of evidence relating to Figueroa's use of a cane was contrary to various Social Security regulations and rulings, including SSR 83-14 and SSR 96-9p.  The Commissioner contends that the ALJ reasonably evaluated the evidence regarding Figueroa's alleged need to use a cane and the ALJ's determination with respect to the cane is supported by substantial evidence.

The ALJ found that Figueroa had the RFC to perform light work with non-exertional limitations.  Tr. 22.  As explained in the Social Security Rulings, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10, 1983-1991 Soc.Sec.Rep.Serv. 24, * 6 (Jan. 1, 1983).  Also, "unskilled light jobs . . . require use of arms and hands to grasp and to hold and turn objects."  *Id.*; *see also* SSR 83-14, 1983-1991 Soc.Sec.Rep.Serv. 41, * 4 (Jan. 1, 1983).  "Any limitation on these functional abilities must be considered very carefully to determine its impact on the size of the remaining occupational base of a person who is otherwise found functionally capable of light work."  SSR 83-14, 1983-1991 Soc.Sec.Rep.Serv. 41, * 4.

Social Security Ruling 96-9p states the following regarding consideration of hand-held assistive devices:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.

SSR 96-9p, 1996 WL 374185, * 7 (July 2, 1996).

Figueroa argues that, contrary to SSR 83-14, the ALJ did not carefully consider the effects of his use of a cane on the light work occupational base.  Figueroa contends that his need to use a cane would cause significant work-related limitations with respect to his ability to perform light work because the need to use a cane would limit him to having only one hand available to lift and carry objects while standing/walking.   Figueroa also argues that, because the ALJ acknowledged that Figueroa at times used a cane, the ALJ was obligated to make a finding as to under what circumstances Figueroa required use of a cane.

Here the ALJ did not ignore evidence regarding Figueroa's use of cane.  Nor did the ALJ fail to evaluate that evidence or explain his reason for not including the need to use a cane in the RFC.  For example, when explaining his findings relative to alleged use of a cane and the objective medical evidence regarding the impact of Figueroa's impairments on his ability to stand and/or walk, the ALJ stated:

> The claimant testified to use of a cane, but there is no indication that he is unable to ambulate effectively.  In fact, the record contains occasional findings of an antalgic gait; however, he is generally described as having a normal gait, and no difficulty in ambulating.  (Hearing testimony; (Exhibit 6F, p. 58, 61; Exhibit 9F, p. 3-4, 7; Exhibit l0F, pg. 9-10; Exhibit 11F, p. 6, 11, 16-17, 21-22, 27).

\*\*\*

The claimant testified that the pain in his lower back affects his ability to stand and walk. He testified that he uses a cane because he has trouble balancing, and can stand and walk only a few feet without it.

Tr. 21-22, 23.

Moreover, the ALJ stated:

The claimant testified that he uses a cane frequently to walk at home and outside of his home. However, when he completed a Function Report (SSA Form 3373-BK) on April 27, 2017, he reported that he was supposed to get a cane, but "never received it."  His general practitioner's office visit notes from March 22, 2107 and May 25, 2017 show that the claimant was "requesting [a] cane," and lists "Cane" as a treatment for lumbar intervertebral disc in one note, and "chronic thoracic back pain" in another note.  However, there are no corresponding physical examination findings of abnormal gait or leg weakness to show that his physicians prescribed a cane to ambulate.  In fact, during the office visit on March 22, 2017, his gait is described as "upright and steady," although there were findings of a reduction in lumbar range of motion and a straight leg raise was positive in his left lower extremity. On May 25, 2017, physical examination findings described his gait and range of motion as normal.   Additionally, there is no mention of cane use in the most recent treatment records from the claimant's pain management specialist, Dr. Friedhoff, at the St. Vincent Spine and Ortho Institute, whose records note that the claimant has an antalgic gait on two visits, but otherwise contain findings of a normal heel to toe gait pattern bilaterally. These records show that while the claimant may have used a cane for some period of time after March 22, 2017, there is no indication that he was regularly using it to walk when he was seen by Dr. Friedhoff, from November 20, 2017 through March 27, 2018. (Exhibit 6F, p. 58, 61; Exhibit 9F, p. 3-4, 7; Exhibit l0F, pg. 9-10; Exhibit 11F, p. 6, 11, 16-17, 21-22, 27).

Tr. 26.

The foregoing makes clear that the ALJ considered and evaluated the evidence relating to Figueroa's use of cane.  Nevertheless, without a specific citation to legal authority, Figueroa states "Under the rules, even a claimant who only *occasionally* needs to use a handheld assistive device has a significant work-related limitation that must be included in the RFC finding, in order for the finding to accurately describe his maximum capacity to perform work-related tasks." Doc. 15, p. 11 (emphasis in original).  However, evidence that a claimant uses "'a cane at

various times,' does not mean [an] ALJ [is] required to include it in [the claimant's] RFC." *Lewandowski v. Berryhill*, 2019 WL 480644, * 15 (N.D. Ohio Feb. 7, 2019) (quoting *Forester v. Comm'r of Soc. Sec.*, 2017 WL 4769006, * 4 (S.D. Ohio Oct. 23, 2017) and quoting *Grimes v. Berryhill¸* 2018 WL 2305723, * 7 (E.D. Tenn. April 19, 2018).   Thus, the ALJ's acknowledgement that there is evidence in the record that Figueroa reported using a cane and/or that medical records include a record of a cane being used as treatment for his back problems did not require the ALJ to include the need to use a cane in the RFC assessment.

Additionally, "[w]here there is conflicting evidence concerning the need for a cane, 'it is the ALJ's task, and not the Court's, to resolve the conflicts in the evidence.'"  *Forester*, 2017 WL 4769006, * 4 (quoting *Foreman v. Comm'r of Soc. Sec.*, 2012 WL 1106257, * 4 (S.D. Ohio Mar. 31, 2012)).  As indicated herein, the ALJ considered and weighed evidence relating to Figueroa's use of, and need to use, a cane.  In doing so, the ALJ concluded that the evidence did not support inclusion of a limitation in the RFC for use of a cane, either regularly or occasionally.  Here, the ALJ did not ignore evidence.  Rather, he considered and weighed the evidence.   And, it is not this Court's role to resolve conflicts in the evidence, including conflicts in evidence pertaining to Figueroa's need to use a cane.  *Id.*; *see also Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

Moreover, Figueroa has not shown that the ALJ's findings relative to the need for a cane is not supported by substantial evidence.  Nor has he shown that the ALJ's determination that Figueroa can perform light exertional work is not supported by substantial evidence.  The state agency reviewing physicians reviewed the evidence and found that Figueroa could perform light work and the ALJ considered and relied on those opinions in finding that Figueroa had the RFC

to perform light work.  Tr. 27.  The ALJ also considered Figueroa's subjective statements regarding his need to use a cane and limitations on walking and standing but found that those statements were not entirely consistent with the record.  Tr. 25.  Figueroa has not argued or shown that the ALJ's evaluation of his subjective statements regarding the extent and limiting effects of his symptoms was improper or unsupported by substantial evidence.

Considering the foregoing, the Court finds that Figueroa has not shown that the ALJ erred in evaluating evidence regarding Figueroa's use of a cane.  Moreover, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.  Thus, since Figueroa has not shown that the ALJ's findings are not supported by substantial evidence, even if he could demonstrate that there is evidence in the record to support the need for use of a cane or a more restrictive RFC, reversal and remand is not warranted.

**C.    The ALJ did not err in finding that Figueroa had limited, rather than no, English proficiency**

Figueroa argues that the ALJ's determination regarding Figueroa's ability to communicate in English is not supported by substantial evidence.

The ALJ concluded that Figueroa "has a limited education and limited English proficiency."  Tr. 28.  The ALJ also found that "[e]ven if the claimant were completely unable to communicate in English, as he alleges, the use of the regulations used to determine the maximum sustained work capability for individuals limited to light work would not direct a finding that the claimant is disabled."  Tr. 28.

"The ability to communicate in English is relevant to the ALJ's education determination." *Rivera v. Comm'r of Soc. Sec.*, 2014 WL 4956224, *13 (N.D. Ohio Sept. 30,

2014) (citing *Garcia v. Sec'y of Health & Human Servs.,* 46 F.3d 552, 554 (6th Cir.1995)). "The regulations acknowledge that English is the dominant language of this country, so it may be difficult for someone who does not speak English to get a job." *Id.* (citing 20 C.F.R. § 404.1564(b)(5)).[6]  "However, the ability to communicate in English is not dispositive to the determination of disability." *Id.*

The ALJ considered Figueroa's allegations that he is unable to speak or understand English but concluded that the record did not provide full support regarding Figueroa's statements.  Tr. 26.  The ALJ explained his finding in detail, stating:

> The records do not provide full support for the claimant's testimony regarding his inability to speak or understand English.  When the claimant completed his applications for supplemental security income and disability insurance benefits, he indicated that he did not speak, read, or understand English.  The claimant testified that his wife accompanied him to all medical appointments, and when he worked in the past, his supervisors and coworkers communicated with him in Spanish. Records from the Disability Determination Services state agency note that the claimant requested an interpreter to speak to them over the phone and requested a Spanish interpreter for his consultative examination.   On the other hand, the state agency records also show that the claimant was able to speak well enough with them on the phone to request that they call back and speak to his wife. Additionally, several of the claimant's medical records indicate that he provided his medical history, which was limited by language barrier, but that no language interpreter was used, which contradicts the claimant's testimony that his wife always accompanied him to appointments. On this matter, the undersigned accepts the claimant's allegations of a limited ability to communicate with others in English.  While there is some indication that the claimant does not have as great limitation as he alleges in this area, the undersigned is mindful that some treatment providers do not document the use of translators during appointments.  The undersigned also notes that the claimant had a limited education in his primary language.  (Exhibit lA, p. 4; Exhibit 2A, p. 4; Exhibit 10F, p. 5, 12, 24; Hearing testimony).

Tr. 26.

Figueroa points to evidence that he contends demonstrates that he is unable to communicate in English and he argues that the ALJ did not adequately explain how the evidence

---

[6] 20 C.F.R. § 404.1564, as amended with an effective date of April 27, 2020, deleted 20 C.F.R. § 404.1564(b)(5).

cited by the ALJ demonstrates an ability to communicate in English.  However, as indicated above, the ALJ considered such evidence and it is not for this Court to "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387. And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones*, 336 F.3d at 477. While Figueroa disagrees with the ALJ's analysis of the evidence relevant to his ability to communicate in English, Figueroa has not shown that the ALJ's determination is not supported by substantial evidence.  The ALJ acknowledged that Figueroa had limited proficiency in English but did not find that the record fully supported Figueroa's claim that he had no ability to communicate in English.  The ALJ's finding that Figueroa was not completely unable to communicate in English is supported by his counsel's statements at the hearing.  For example, Figueroa's counsel stated Figueroa "speaks and understands some English."  Tr. 37; *see also* Tr. 42 (Figueroa's counsel stating, Figueroa "can understand and speak some English.  It's not perfect.  But I don't know that it's bad enough to exactly meet the definition of illiteracy there, but he does have an inability to read and write in English.").

Figueroa also argues that, even if you put aside the evidence he contends shows he cannot adequately communicate verbally in English, the ALJ erred because he did not identify specific evidence demonstrating that Figueroa can read or write in English and the record would not support such a finding.  Doc. 15, p. 16.  To support his claim that he cannot read or write in English, he relies on statements he made in connection with his disability report (Tr. 235) and statements made by his counsel at the hearing (Tr. 37-38).  Doc. 15, p. 15.  The disability report, reflects that Figueroa reported he could not speak and understand English, read and understand

English or write more than his name in English. Tr. 235. At the hearing, Figueroa's counsel stated that, while Figueroa could speak and understand some English, he "can't read or write in English." Tr. 37; *see also* Tr. 42 (Figueroa's counsel stating, "he does have an inability to read and write in English."). At the hearing, the ALJ inquired about Figueroa's claim that he could not read English, asking him whether he is able to read road signs while he is driving. Tr. 52. Figueroa responded that he could understand some signs but not others. Tr. 52. This testimony undercuts Figueroa's claim that he is wholly unable to read or understand English. Tr. 25-26. And, other than his own subjective statements and argument by his counsel at the hearing, Figueroa does not provide evidence of his inability to read or write in English. As discussed above, the ALJ did not ignore Figueroa's allegations regarding his inability to communicate in English. The ALJ considered Figueroa's subjective statements but found that they were not entirely consistent with evidence in the record. Tr. 25-26.

Considering the foregoing, the Court finds the ALJ's determination that Figueroa has limited English proficiency is supported by substantial evidence. Further, the Court finds that the ALJ's Step Five finding is supported by substantial evidence. In response to questioning by the ALJ regarding the jobs identified in response to a hypothetical question that encompassed the ALJ's RFC limitations, the VE testified that the jobs could be performed by someone who was not a native English speaker but who could understand some English. Tr. 29, 57-58. The VE also indicated that the jobs could be learned by a brief demonstration. Tr. 29, 57-58.

Figueroa argues that the Grid directs a finding of "disabled," and therefore the VE's testimony relative to performance of jobs by someone with limited proficiency in English is irrelevant. However, Figueroa's argument that the VE's testimony is irrelevant is premised on his arguments that the ALJ erred in finding he did not require a cane and that the ALJ erred in

finding that he had some limited proficiency in English.  As discussed herein, the Court finds that the ALJ did not err in either respect.

Also, "a person is not *per se* disabled if he or she is illiterate or unable to communicate in English."  *Al Jalham v. Comm'r of Soc. Sec.*, 2019 WL 7584406, * 8 (E.D. Mich. Aug. 26, 2019), *report and recommendation adopted*, 2019 WL 5558357 (E.D. Mich. Oct. 29, 2019). And, "while the inability to communicate in English may erode the unskilled occupational base in the light work category, it does not render someone automatically unable to work."  *Id.*  at * 9. Therefore, it is appropriate for an ALJ to rely upon VE testimony to determine whether or how a claimant's limited proficiency in English impacts the availability of jobs.  *Id*. at * 9-10.

Considering the foregoing, the Court finds that Figueroa has not demonstrated that VE testimony is irrelevant or that the ALJ's reliance on VE testimony to support his Step Five finding was improper.

### VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: October 13, 2020

/s/ *Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge